**Eddie S. ROTHWELL, Sr., Appellant**

v.

**E. Eloise SINGLETON, Individually; and E. Eloise Singleton, Administratrix of the Estate of Jewell E. Rice, Deceased, Appellees.**

No. 2007–CA–001348–MR.

Court of Appeals of Kentucky.

June 6, 2008.

Frederick V. Short, Hustonville, KY, for Appellant.

Ephraim W. Helton, Danville, KY, for Appellees.

Before KELLER and THOMPSON, Judges; GRAVES,[1] Senior Judge.

### OPINION

THOMPSON, Judge.

This is a will contest action wherein it is alleged that a holographic will is void because the testator lacked testamentary capacity and the beneficiary exerted undue influence over the testator. The trial court found that because a prior jury found that the testator had testamentary capacity when she executed a different will, the doctrine of *res judicata* applied

and dismissed the claim. As to the issue of undue influence, the trial court directed a verdict in favor of the sole beneficiary, E. Eloise Singleton.

The parties to this action have a lengthy history of family discord and their relationships with one another have been less than harmonious.[2] The testator, Jewell E. Rice, was the mother of six children, four of whom survived her. Five of her wills were admitted into evidence, but according to the testimony at trial, she had executed more than nineteen wills during her lifetime. The testimony further revealed that the numerous wills were executed in response to her disapproval of the behavior of one or more of her children, who would then be disinherited as a form of punishment.

Two of the wills and the facts surrounding their execution, have particular significance to the present controversy: the will that is the subject of the present controversy was executed on December 12, 1999, and the final will executed on December 28, 1999, was declared void after a jury found it to be executed under undue influence. Both left the entirety of the estate to Eloise.

In 1999, Jewell was ninety years old. In August of that year, she fell and broke her leg while being cared for by her daughter, Helen Simpson. Jewell was advised to receive two weeks of physical therapy and was placed in a nursing home; prior to the expiration of that time, she was removed from the nursing home by Eloise. Thereafter, until Jewell's death on December 18, 2000, Eloise and her husband resided in Jewell's basement and provided daily care.

1. Senior Judge John W. Graves sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

2. The complaint was filed by Eddie S. Rothwell, Sr.; Helen M. Simpson; Kenneth W. Rothwell; and Gary E. Rothwell. Eddie S. Rothwell, Sr. is the only appellant.

The holographic will bequeaths Jewell's entire estate to Eloise and states: "Eloise is my only help over many years." It appears from the handwritten document that Jewell had some difficulty writing Eloise's name and twice incorrectly spelled her name within the three sentence document.

The initial question to be resolved is whether the doctrine of *res judicata* precludes the claim that Jewell lacked testamentary capacity to execute the will of December 12, 1999. The concept of *res judicata* and its legal requirements was explained in *Yeoman v. Com., Health Policy Bd.*, 983 S.W.2d 459 (Ky.1998):

> The rule of *res judicata* is an affirmative defense which operates to bar repetitious suits involving the same cause of action. The doctrine of res judicata is formed by two subparts: 1) claim preclusion and 2) issue preclusion. Claim preclusion bars a party from re-litigating a previously adjudicated cause of action and entirely bars a new lawsuit on the same cause of action. Issue preclusion bars the parties from relitigating any issue actually litigated and finally decided in an earlier action. The issues in the former and latter actions must be identical. The key inquiry in deciding whether the lawsuits concern the same controversy is whether they both arise from the same transactional nucleus of facts. If the two suits concern the same controversy, then the previous suit is deemed to have adjudicated every matter which was or could have been brought in support of the cause of action.
>
> For claim preclusion to bar further litigation, certain elements must be present. First, there must be identity of the parties. Second, there must be identity of the causes of action. Third, the action must have been resolved on the merits. The rule that issues which have been once litigated cannot be the subject matter of a later action is not only salutary, but necessary to the speedy and efficient administration of justice.
>
> . . . .
>
> For issue preclusion to operate as a bar to further litigation, certain elements must be found to be present. First, the issue in the second case must be the same as the issue in the first case. Second, the issue must have been actually litigated. Third, even if an issue was actually litigated in a prior action, issue preclusion will not bar subsequent litigation unless the issue was actually decided in that action. Fourth, for issue preclusion to operate as a bar, the decision on the issue in the prior action must have been necessary to the court's judgment.

*Id.* at 464–465 (footnotes and internal quotations omitted).

The trial court found that the issue of Jewell's testamentary capacity to execute the will on December 12, 1999, was resolved in the prior will contest where it was held that Jewell had such capacity. A jury subsequently found, however, that the will was executed under undue influence. Consequently, the December 12, 1999, will was offered to probate.

■ The prior action involved a will that was executed sixteen days after December 12, 1999. Thus, the question is whether a testator's testamentary capacity at a time other than that during which the contested will was executed, is decisive of the issue. We believe it is not and conclude that the court erred when it dismissed the claim of testamentary capacity based on the rule of *res judicata*.

The issue in the prior action was Jewell's testamentary capacity on December

28, 1999. The issue before us is Jewell's mental capacity on December 12, 1999.

■ To validly execute a will, a testator must: "(1) know the natural objects of her bounty; (2) know her obligations to them; (3) know the character and value of her estate; and (4) dispose of her estate according to her own fixed purpose." *Bye v. Mattingly,* 975 S.W.2d 451, 455 (Ky.1998)(internal citations omitted). In *Bye,* the Court refused to rule that a judgment of partial disability removed the capacity of a ward to draft a will. The Court applied the lucid interval doctrine under which a testator who suffers from a mental illness that "ebbs and flows" in terms of its effect on mental competency is presumed to have executed the will during a lucid interval. *Id.* at 456. The Court's acceptance of the lucid interval doctrine reaffirms and is based on the principle that the issue is whether testamentary capacity existed at the time the will was executed. Although only a short time elapsed between the executions of both wills, her testamentary capacity is only relevant at the time of the execution of the December 12, 1999, will. *Id.* at 455.

■ On remand, the appellant will have an onerous burden. "In Kentucky there is a strong presumption in favor of a testator possessing adequate testamentary capacity. This presumption can only be rebutted by the strongest showing of incapacity." *Id.* However, we hold that the doctrine of *res judicata* cannot be applied to the issue of testamentary capacity to execute a will not challenged in a prior proceeding.

The issue of undue influence was resolved by the trial court's grant of a directed verdict to Eloise, thus, our standard of review is as follows:

The standard of review for an appeal of a directed verdict is firmly entrenched in our law. A trial judge cannot enter a directed verdict unless there is a complete absence of proof on a material issue or there are no disputed issues of fact upon which reasonable minds could differ. Where there is conflicting evidence, it is the responsibility of the jury to determine and resolve such conflicts. A motion for directed verdict admits the truth of all evidence favorable to the party against whom the motion is made. Upon such motion, the court may not consider the credibility of evidence or the weight it should be given, this being a function reserved for the trier of fact. The trial court must favor the party against whom the motion is made, complete with all inferences reasonably drawn from the evidence. The trial court then must determine whether the evidence favorable to the party against whom the motion is made is of such substance that a verdict rendered thereon would be "palpably or flagrantly" against the evidence so as "to indicate that it was reached as a result of passion or prejudice." In such a case, a directed verdict should be given. Otherwise, the motion should be denied.

It is well-argued and documented that a motion for a directed verdict raises only questions of law as to whether there is any evidence to support a verdict. While it is the jury's province to weigh evidence, the court will direct a verdict where there is no evidence of probative value to support the opposite result and the jury may not be permitted to reach a verdict based on mere speculation or conjecture.

*Gibbs v. Wickersham,* 133 S.W.3d 494, 495–96 (Ky.App.2004)(internal citations omitted).

■ The essence of a claim of undue influence is that prior to or during the execution of the will, the testator was so inappropriately influenced that she no

longer possessed the free will to dispose of her property in accordance with her own judgment. Because it is usually subtly imposed and exerted without witnesses, direct proof of undue influence is generally unavailable. *Zeiss v. Evans,* 436 S.W.2d 525 (Ky.1969). As a result, the courts are required to examine the "badges" of undue influence. Such badges include:

> [A] physically weak and mentally impaired testator, a will which is unnatural in its provisions, a recently developed and comparatively short period of close relationship between the testator and principal beneficiary, participation by the principal beneficiary in the preparation of the will, possession of the will by the principal beneficiary after it was reduced to writing, efforts by the principal beneficiary to restrict contacts between the testator and the natural objects of his bounty, and absolute control of testator's business affairs.

*Bye,* 975 S.W.2d at 457 (internal citations omitted).

■ When the will provides for an unequal or unnatural disposition and there is slight evidence of the exercise of undue influence, the evidence will be deemed sufficient to submit the case to the jury. *Burke v. Burke,* 801 S.W.2d 691 (Ky.App. 1990).

■ Jewell was described by her children as a strong-willed individual. However, at the time she executed the will in controversy, she was elderly and physically weakened. The evidence that she suffered from a mental infirmity consisted primarily of a notation by Dr. Finely Hendrickson who treated Jewell in August 1999 that Jewell suffered from Alzheimer's disease. Although no other physician made a similar diagnosis, Dr. Hendrickson's testimony was evidence upon which a jury could conclude that Jewell suffered from a diminished mental capacity at the time the will was executed. Moreover, the will itself could be viewed as evidence of her mental capacity. Within the relatively brief document, she twice misspelled Eloise's name. A jury could reasonably conclude that absent some diminished mental capacity, a testator would properly spell the name of the sole beneficiary, particularly when, as here, that beneficiary is the testator's child.

The will in question leaves the entirety of the estate to Eloise and leaves nothing to the remaining children. Although the omission of the remaining children could be attributed to the dissension between them and Jewell, a jury could reasonably conclude that such was caused by the influence exerted by Eloise.

When the wills admitted into evidence are examined closely, only the two wills written in December 1999, bequeath the entire estate to a sole beneficiary, Eloise.

According to the testimony at trial, none of the children were consistent in their relationships with Jewell; Eloise's relationship intensified, however, after she removed Jewell from the nursing home and began living in her residence. Immediately after Eloise resumed care for Jewell, Jewell revoked Helen Simpson's Power of Attorney which was then mailed to Helen in an envelope mailed and addressed by Eloise.

We conclude that there were sufficient "badges" of undue influence to submit the issue to the jury.

For the foregoing reasons, we reverse and remand for further proceedings.

ALL CONCUR.